DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

JAMES H. STEIGERWALD
DIRECT DIAL: 215.979.1145
PERSONAL FAX: 215.689.4407
*E-MAIL:* JHSteigerwald@duanemorris.com

*www.duanemorris.com*

November 26, 2008

VIA ECF FILING

The Honorable Mona K. Majzoub
United States Magistrate Judge
United States District Court for the
Eastern District of Michigan
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd.
Detroit, Michigan 48226

Re:     Cumberland Truck Equipment Co. v. Detroit Diesel Corporation, No. 05-74594
        Diamond International Trucks Inc. v. Detroit Diesel Corporation, No. 05-74930

Dear Judge Majzoub:

At yesterday's motion hearing, you granted our request for leave to submit additional information related to the charts prepared by counsel for Defendants for the hearing. Accordingly, we attach to this letter two charts, as well as certain supporting information.

Thank you very much.

Respectfully,

James H. Steigerwald

JHS/mrs
Attachments
cc:     Counsel of record (via ECF filing) (with attachments)

DM11\470172

## CHART 1:
## PLAINTIFFS' SUMMARY OF ELECTRONIC PRODUCTION

### Cumberland Truck Equipment Co.

| Electronic Transactional Data | "Mackie Mason Data" | Electronic User Files |
|---|---|---|
| As Defendants admit, Cumberland produced a complete data set from January 2000 – January 2008. See Steigerwald 8/13/08 letter (Wells Aff., Ex. A) and supplemental letter dated 10/27/08.<br><br>No possible spoliation issue. | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data. As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants' chart incorrectly states that there is "no evidence of steps taken to preserve emails."<br><br>As Defendants know from the 30(b)(6) depositions, Cumberland conducted a "thorough search of all PCs. . . . to find and print any e-mail or other documentation that would exist on their PCs regarding the [Defendants'] requests for documentation." Sheldon Dep., 77:5-19 (attached hereto).<br><br>In addition, Cumberland did not have a policy or practice for the preservation of electronic documents before this litigation, which accounts for the percentage of pre-2005 files in Cumberland's production. Ex. E to Palumbos Aff. (attached as Ex. 1 to Opposition Brief). |

1        IN THE UNITED STATES DISTRICT COURT FOR THE
                EASTERN DISTRICT OF MICHIGAN

2

            - - - -

3

    CUMBERLAND TRUCK EQUIPMENT   )

4    CO., et al., on behalf of    )
    themselves and all others    )

5    similarly situated,       )
                      )

6           Plaintiffs,   )
                      )

7        -vs-      )Civil Action No.
                 )2:05-cv-74594-AJT-MKM

8    DETROIT DIESEL CORPORATION,   )
    et al.,              )

9                    )
          Defendants.   )

10    _____)
    DIAMOND INTERNATIONAL TRUCKS, )

11    INC., et al., on behalf of   )
    themselves and all others    )

12    similarly situated,       )
                      )

13           Plaintiffs,   )Civil Action No.
                 )2:05-cv-74930-JF-RSW

14        -vs-      )
                 )

15    DETROIT DIESEL CORPORATION,   )
    et al.,              )

16                    )
          Defendants.   )

17

18

19

20

            - - - -

21

        DEPOSITION OF:  BRIAN SHELDON

22

            - - - -

23

24

Sheldon, Brian (Cumberland)  11/28/2007  9:22:00 AM

1                    DATE:   November 28, 2007

                        Wednesday, 1:46 p.m.

2

3            LOCATION:   DUANE MORRIS, LLP

                        5010 U.S. Steel Tower

4                        600 Grant Street

                        Pittsburgh, PA  15219

5

6            TAKEN BY:   Defendants

7

             REPORTED BY:   JoAnn M. Brown, RMR, CRR

8                    Notary Public

                        AKF Reference No. JB04319A

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

E2416_00001_LongHorn_Detroit Diesel          Unsigned                    Page  2

Sheldon, Brian (Cumberland)  11/28/2007  9:22:00 AM

1   Q.   Okay.  And is the archive process that we

2        discussed earlier done automatically or is it

3        initiated by someone at the dealership?

4   A.   Automatically.

5   Q.   And have any steps been taken, since the

6        dealership filed this litigation, to preserve

7        data that's either available on the network or

8        that was available on individual PCs?

9   A.   Yes.

10  Q.   What steps were taken?

11  A.   A thorough search of PCs were done.

12  Q.   Who conducted that search?

13  A.   I spearheaded it, requested it of all of the

14       management parties that I mentioned earlier to

15       find and print any e-mail or other

16       documentation that would exist on their PCs

17       regarding the requests for documentation.

18       Those individual PC users were responsible for

19       searching their own PCs.

20  Q.   Was there a directive in writing that was sent

21       to the managers?

22  A.   No.

23  Q.   How was that request conveyed?

24  A.   A meeting.

Landmark International Trucks, Inc.

| Electronic Transactional Data | "Mackie Mason Data" | Electronic User Files |
|---|---|---|
| Landmark produced data for (1) parts sales in connection with service from January 1995 to June 2008; (2) labor data for parts installed in connection with service from November 1996 to June 2008, and (3) data for over-the-counter parts transactions from April 2002 to June 2008. Steigerwald 8/13/08 letter.<br><br>Pre-2002 data for over-the-counter transactions not retained during a system upgrade performed in April 2002, three years before this litigation began.  Jablonski Aff. (Ex. 5 to Opp. Br.). | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data.  As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants question why the majority of files post-dated 2005 and misleadingly state on their chart that there is "no evidence of steps taken to preserve emails."<br><br>However, as Defendants know from the 30(b)(6) depositions, Landmark did not have email prior to 2005.  Palumbos Aff., Ex. F.  Therefore, Landmark's production naturally included a lower percentage of pre-2005 electronic files.<br><br>In addition, as Defendants themselves have repeatedly stated, post-2005 emails are not relevant to this litigation and, therefore, cannot be spoliated.  See Defs. Br. Supp. Mot. 2, 10-11; McGrath Aff., ¶ 9 (noting that documents post-dating events that gave rise to this litigation are "irrelevant"). |
| No possible spoliation issue. | | |

DM1\1447017.2

## Diamond International Trucks, Inc.
### AND
## Mid-America International Trucks, Inc.

| | "Mackie Mason Data" | Electronic User Files |
|---|---|---|
| **Electronic Transactional Data** | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data. As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants themselves note that 37% of electronic documents produced by Diamond and Mid-America pre-date 2005, and do not allege in their Motion that there is any evidence of spoliation. |
| Produced a complete data set from January 2003 – April 2008. Steigerwald 8/13/08 letter. | | However, Defendants state incorrectly on their chart that there was "no evidence of steps taken to preserve emails." In fact, as Defendants know from the 30(b)(6) depositions, Diamond and Mid-America stopped overwriting their backup tapes that stored email from the server in response to this litigation. Gill Dep., 75:5-16 (attached hereto). |
| Began retaining transactional data on system in 2003, two years before litigation commenced. Gill Aff. (Ex. 4 to Opp. Br.). | | |
| No possible spoliation issue for either Diamond or Mid-America. | | |

DM1\1447017.2

1              IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF MICHIGAN

2

                        - - - -

3

       CUMBERLAND TRUCK EQUIPMENT    )
4      CO., et al., on behalf of    )
       themselves and all others    )
5      similarly situated,          )
                                    )
6            Plaintiffs,    )
                                    )
7          -vs-         )Civil Action No.
                        )2:05-cv-74594-AJT-MKM
8      DETROIT DIESEL CORPORATION,   )
       et al.,              )
9                          )
             Defendants.   )
10     _____)
       DIAMOND INTERNATIONAL TRUCKS, )
11     INC., et al., on behalf of   )
       themselves and all others    )
12     similarly situated,          )
                                    )
13           Plaintiffs,   )Civil Action No.
                        )2:05-cv-74930-JF-RSW
14         -vs-         )
                        )
15     DETROIT DIESEL CORPORATION,   )
       et al.,              )
16                         )
             Defendants.   )
17
18
19
20             - - - -
21         DEPOSITION OF:  SCOTT GILL
22             - - - -
23
24

1                       DATE:   November 28, 2007

                        Wednesday, 8:49 a.m.

2

3            LOCATION:   DUANE MORRIS, LLP

                        5010 U.S. Steel Tower

4                       600 Grant Street

                        Pittsburgh, PA  15219

5

6            TAKEN BY:   Defendants

7

             REPORTED BY:   JoAnn M. Brown, RMR, CRR

8                       Notary Public

                        AKF Reference No. JB04319

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      recover them for 30 days.

2   Q.   And fully deleted means they're not saved on

3      the server or in archives?

4   A.   Correct.

5   Q.   Were any steps taken, after Diamond and

6      Mid-America sued Detroit Diesel, to place on

7      hold any deletion of e-mail or other electronic

8      files?

9   A.   We have a three-year rotation on our tapes, and

10      we stopped reusing our backup tapes, so now we

11      have more than three years.  I don't know how

12      far back it goes, but we have more than three

13      years of those backup tapes.

14   Q.   These are the backup tapes that the system is

15      backed up on?

16   A.   Correct.

17   Q.   Can you describe that process for me?

18   A.   It's a nightly routine.  There are three types,

19      one for the AS/400, two for the servers, and

20      each night the routine run backs up those

21      servers and the AS/400.  We keep a 14-day

22      rotation, and we keep an end-of-the-month tape.

23   Q.   And those end-of-the-month tapes are the ones

24      that are maintained for three years?

## Southland International of Louisiana, L.L.C.

| Electronic Transactional Data | "Mackie Mason Data" | Electronic User Files |
|---|---|---|
| Southland retained all transactional data from before August 2004 on a server used with a DDS accounting system. Dupre Aff. (Ex. 6 to Opp. Br.) However, a hardware failure with the server – and not any action or omission by Southland – prevented the restoration of this data by multiple computer vendors. Dupre Aff.; Palumbos Aff. ¶¶ 4-5.<br><br>In August 2004, Southland switched from the DDS system to its current business data system, which is provided by Karmak (a third-party vendor). Dupre Aff. (Ex. 6 to Opp. Br.). Southland produced data from the Karmak system from July 2006 – July 2008.<br><br>By default, Southland's Karmak system automatically overwrites detailed transactional data after 24 months. Dupre Aff. (Ex. 6 to Opp. Br.) However, regardless of this default setting, Southland could not have produced the relevant data on the DDS server from 2000 – 2002, which Defendants describe as the **"critical time period at issue."** Defs. Br. Supp. Mot. 2. Without the pre-2002 data, the post-2002 data is not material. | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data. As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants claims that Southland spoliated emails because only 4% of the electronic files produced pre-dated 2005.<br><br>However, Southland did not have email before 2003. Dupre Aff. (Opp. Br., Ex. 6). In addition, before this litigation, Southland had no policy or practice for the preservation of electronic documents. Dupre Aff. These facts account for the percentage of pre-2005 files in Southland's production. |

4

DM1\44701\2

## Allegheny Trucks, Inc.

| Electronic Transactional Data | "Mackie Mason Data" | Electronic User Files |
|---|---|---|
| Produced data from July 2006 – July 2008. Steigerwald 8/13/08 letter.<br><br>By default, Allegheny's business data system, which is provided by Karmak, automatically overwrites detailed transactional data after 24 months.  Brower Aff. (Ex. 3 to Opp. Br.).<br><br>Allegheny was unaware of this default setting prior to the request for transactional data from DDC.  Brower Aff.<br><br>Even if Allegheny had disengaged the default setting shortly before the filing of the lawsuit in 2005 (although Allegheny was unaware of the setting at that time), Allegheny still could not have produced the relevant data from the "critical time period" of 2000 – 2002.  Without the pre-2002 data, the post-2002 data is not material. | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data.  As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants' chart suggests that Allegheny took no steps to preserve emails.  However, Defendants completely ignore testimony from the 30(b)(6) deposition that Allegheny routinely printed emails before deleting them if they were needed.  Palumbos Aff., Ex. D (Brower Dep., 61:12-62:2).<br><br>In addition, Allegheny did not have a policy or practice for the preservation of electronic documents before this litigation, which accounts for the percentage of pre-2005 files in Allegheny's production.  Palumbos Aff., Ex. D. |

| Texas Truck Centers, LLP | | |
| --- | --- | --- |
| **Electronic Transactional Data** | **"Mackie Mason Data"** | **Electronic User Files** |
| Produced data from November 2005 – November 2006 and July 2007 – July 2008. Steigerwald 8/13/08 letter.

By default, Texas Truck's business data system, which is provided by ADP (a third-party vendor), automatically overwrites detailed transactional data after 12 months. Boone Aff. (Ex. 7 to Opp. Br.). Texas Truck was unaware of this default setting until it responded to DDC's request for the data in 2008. Boone Aff.

Because of the 12 month retention period, even if Texas Truck had disengaged the default setting shortly before the filing of the lawsuit in 2005 (although Texas Truck was unaware of the setting at that time), Texas Truck still could not have produced the relevant data from the "critical time period" of 2000 – 2002. In fact, if Texas Truck had disengaged the setting as early as December 2003, it could not have produced data from before December 2002. Without the pre-2002 data, the post-2002 data is not material. | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data. As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants themselves note that 27% of electronic documents produced by Texas Truck pre-date 2005, and do not allege in their Motion that there is any evidence of spoliation.

Defendants suggest on their chart that Texas Truck should have been saving emails received after the litigation. But, as Defendants themselves repeatedly stated, post-2005 emails are not relevant to this litigation and, therefore, cannot be spoliated. See Defs. Br. Supp. Mot. 2, 10-11; McGrath Aff., ¶ 9 (noting that documents post-dating events of this litigation are "irrelevant"). |

6

| Wheeling Truck Center, Inc. | | |
|---|---|---|
| **Electronic Transactional Data** | **"Mackie Mason Data"** | **Electronic User Files** |
| Produced data from May 2006 – January 2008. Steigerwald 8/13/08 letter. Older data was erased by ADP, Wheeling's previous third-party vendor, when Wheeling switched business data systems in May 2006. Palumbos Aff., Ex. C (Remp Dep, 23:16-20.) | The data Dr. Mackie Mason referred to in his affidavit is the exact same data referenced in the electronic transactional data column, not a separate category of data. As noted in his supplemental affidavit, this data is supplemented by other financial data produced in hard copy. | Defendants claims that Wheeling spoliated emails because 9% of the emails produced pre-dated 2005. |
| Data from Wheeling's ADP system stored for data for a maximum of 24 months. Palumbos Aff., Ex. C (Remp Dep., 61:17-62:9.) Thus, even if Wheeling had retained all data that it had from its previous system at the beginning of the litigation, Wheeling still could not have produced the relevant data from the "critical time period" of 2000 – 2002. | | However, the percentage of pre-2005 emails in Wheeling's production can be accounted for by the fact that Wheeling had no policy or practice for the preservation of electronic documents. Palumbos Aff., Ex. C. |
| Defendants' chart selectively quotes from Wheeling's 30(b)(6) deposition in order to create the false impression that Wheeling understood that it would lose data when it switched systems in May 2006. The full quote from the deposition – without Defendants' misleading omission of 37 lines of testimony – does not support that view: | | |
| **Q.**  As a result of that conversion [in May 2006], did you lose the ability to access | | |

DM1\1470172

data?

A.   Yes, sir.

**[Defendants' omission begins]**

Q.   And what data did you lose the ability to access?

A.   When we did the conversion in May of '06, we transferred all of our financial — current financial information, we transferred all of our parts inventory and parts history for the last 12 months, and everything other than financial information and parts inventory, all other information resides on the ADP box which we no longer have use of.

Q.   By the ADP box, you mean the ADP server?

A.   Mainframe, yes.

Q.   And why don't you have access to that anymore?

A.   When we cancelled our maintenance contract with ADP, they had the ability to access our system via dial-up, and they dialed up and shut our system down.

Q.   Do you have the ability to reactivate that?

DM1\1447017.2

A. I do not have that ability, no, sir.

Q. Does ADP?

A. I called ADP -- again, in preparation
for this deposition, I called ADP to ask if
they have the ability to pull history from
our mainframe, and they explained to me
that as I'm no longer a client of theirs, that
they would not have an interest in pursuing
that. The young lady spoke with wasn't a
hundred percent sure that that was possible,
but she wasn't even willing to pursue my
request, because I'm not a current client of
theirs.

Q. So she indicated she wasn't even sure it
was possible if they wanted to?

A. She wasn't sure if it was possible,
period.

Q. Okay.

A. If it were possible, she knew that ADP
-- she said that ADP would not have an
interest in providing that service.

**[Defendants' omission ends]**

Q. Did you understand that that would
happen when you converted systems?

A. Yes, sir.

DM1\1447017.2

Remp. Dep., 23:1-24:19 (attached as Ex. E. to Wells Aff.).

The full deposition testimony shows that what Wheeling understood "would happen when [Wheeling] converted systems" was that ADP would no longer assist Wheeling in pulling data from its system, not that Wheeling's data would be erased by ADP. Defendants' chart omits 37 lines of testimony that is necessary to understand the meaning of the testimony.

In fact, as the attached affidavit from Ronald Remp shows, Wheeling did not know when it converted systems in May 2006 that it would lose the data stored on its ADP server. Wheeling wanted to preserve the data on the ADP server for business reasons, in addition to preserving it for litigation purposes, and took steps that it believed would prevent ADP from erasing its data. It was not until after Wheeling converted from ADP to Karmak that Wheeling realized that the data on its ADP server had somehow been erased by ADP, despite Wheeling's efforts to prevent this. Remp Aff. (attached hereto).

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| CUMBERLAND TRUCK EQUIPMENT CO., et al. : <br> Plaintiffs, : <br> v. : <br> : <br> DETROIT DIESEL CORPORATION, et al. : <br> Defendants. : <br> : | Case No. 2:05-CV-74594 <br><br> Hon. Arthur J. Tarnow <br><br> Magistrate Mona K. Majzoub |
| DIAMOND INTERNATIONAL TRUCKS INC., : <br> et al. : <br> Plaintiffs, : <br> v. : <br> : <br> DETROIT DIESEL CORPORATION, et al. : <br> Defendants. : | Case No. 2:05-CV-74930 <br><br> Hon. Arthur J. Tarnow <br><br> Magistrate Mona K. Majzoub |

## AFFIDAVIT OF RONALD REMP

1.      I am the President of Wheeling Truck Center, Inc. ("Wheeling"), a plaintiff in the above-captioned litigation.

2.      On November 27, 2007, I testified as the corporate designee of Wheeling in a Rule 30(b)(6) deposition regarding the production of documents by Wheeling.

3.      I am authorized to testify on behalf of Wheeling about the facts in this Affidavit.

4.      Prior to May 2006, Wheeling used a data storage system provided by Automatic Data Processing ("ADP") to store data relating to customer transactions.

5.      In May 2006, Wheeling began using Karmak's Legend system to store this transactional data.

DM1\1448159.1

6.      When Wheeling discontinued its relationship with ADP, ADP disabled the software Wheeling used to store transactional data storage software and erased the data on the hard drives of the ADP server.

7.      I understand from counsel that Detroit Diesel claims, based on my deposition testimony, that I knew prior to the conversion from ADP to Karmak that Wheeling would lose access to data on the ADP server.  That is incorrect.

8.      Wheeling did not know when it made the conversion from ADP to Karmak that it would lose the data stored on its ADP server.  In fact, Wheeling wanted to preserve the data on the ADP server for business reasons, in addition to preserving it for litigation purposes.

9.      Wheeling took steps that it believed would prevent ADP from erasing its data. Specifically, Wheeling took its ADP server off-line so that ADP could not dial-in and erase data from the hard drives.

10.     It was not until after Wheeling converted from ADP to Karmak that Wheeling realized that the data on its ADP server had somehow been erased by ADP, despite Wheeling's efforts to prevent this.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2008

Ronald Remp

## CHART 2

**Plaintiffs have consistently put Defendants on notice that they sought overcharge damages as a potential remedy for Defendants' conspiracy to raise prices.**

| | |
|---|---|
| Cumberland Am. Compl. ¶ 63<br>Diamond Am. Compl. ¶ 61 | "the Distributors all raised the prices that they charged Plaintiffs and members of the Class and Subclasses for parts to non-competitive levels established by DDC." |
| Cumberland Am. Compl. ¶ 66<br>Diamond Am. Compl. ¶ 64 | "as a result of the price-fixing conspiracy, the prices charged to Plaintiffs and the members of the Class and Subclasses for Detroit Diesel parts were raised significantly and Plaintiffs and the members of the Class and Subclasses we charged at least 35.5% more for Detroit Diesel parts than competing Freightliner, Western Star or Sterling dealers." |
| Cumberland Am. Compl. ¶ 74<br>Diamond Am. Compl. ¶ 72 | "Plaintiffs and members of Subclass 1 (the Price fixing Subclass) purchased Detroit Diesel parts from the Distributors at an artificially and substantially higher price than they would have been charged in the absence of the conspiracy." |
| Cumberland Am. Compl. ¶ 90<br>Diamond Am. Compl. ¶ 88 | "As a direct result of the conspiracy, purchaser in the relevant market(s) have been forced to pay super-competitive prices for Detroit Diesel parts" |
| Cumberland Am. Compl. ¶ 91<br>Diamond Am. Compl. ¶ 89 | "Defendants entered into the conspiracy with the purpose and effect of reducing competition in the relevant market(s) and causing super-competitive prices in the relevant market(s)." |
| Class Certification Brief, p.1 | "As a direct result of this illegal scheme, the Class Members were overcharged for parts they purchased and harmed in their ability to competitively service DDC engines and to sell DDC parts, and thereby lost substantial profits." |
| Class Certification Brief, p.6-7 | discussing Defendants' history of setting prices at super-competitive prices |
| Class Certification Brief, p.13-14 | discussing Defendants' agreement to raise prices during the Class Period |
| Class Certification Brief, p.18. | "Subclass 2 includes all of the Class Members who were designated TM dealers as a consequence of the conspiracy, and thus paid supracompetitive prices and were limited in the extent and nature of warranty work they could perform." |

| | |
|---|---|
| Class Certification Brief, p.19 | "Subclass 1 includes the remainder of the class members who as a consequence of the conspiracy were immediately terminated or nonrenewed, and thus <u>purchased parts at supracompetitive prices</u> and lost the ability to do further warranty work." |
| Class Certification Brief, p.22 | "The Plaintiffs' claims that they paid 'super-competitive' and artificially inflated prices for Detroit Diesel parts are typical of the price fixing claims of the members of the Class arising from the same illegal agreement among the Defendants." |
| Class Certification Brief, p.28 | "Dr. Mackie Mason concludes that Plaintiffs can prove common impact because these dealers paid increased prices for Detroit Diesel parts after their dealership agreements were terminated or not renewed as part of the conspiracy." |
| First Mackie Mason Affidavit, ¶ 48 | "In addition to the group boycott allegation, Class Plaintiffs allege that Detroit Diesel and the Distributors conspired to fix the prices paid by Class Members for Detroit Diesel parts at <u>artificially high levels</u> in violation of Section 1 of the Sherman Antitrust Act.  As a direct result of this conspiracy Class Members paid <u>supra-competitive prices</u> for Detroit Diesel parts.  The prices paid by Class Members were <u>higher than they would have been in the absence of the price fixing conspiracy</u> and were also higher than the prices that competing Freightliner, Western Star and Sterling Dealers paid for DDC parts." |
| First Mackie Mason Affidavit, ¶ 51 | "Class Members were then required to pay significantly higher prices than those that prevailed prior to the conspiracy." |
| First Mackie Mason Affidavit, ¶ 58 | "The prices paid were higher than they would have been in the absence of the conspiracy." |
| First Mackie Mason Affidavit, ¶ 85 | noting that the lost profits methods for calculating damages are only "examples" and "are by no means the only methods of calculating damages" |
| First Mackie Mason Affidavit, ¶ 107 | "it is my understanding that Defendants maintain databases that contain records of transactions with Dealers.  These data may be useful for calculating the volume of business on which the alleged price overcharges occurred.  The data contained in these files are likely to be useful when estimated a damages model." |

DM1\1451004.1

| First Mackie Mason Affidavit, ¶ 109 | "Defendants' price fixing conspiracy caused Class Members to pay supra-competitive prices for Detroit Diesel parts." |
| --- | --- |
| Supplemental Brief in Support of Class Certification, p.16 (Diamond Docket No. 45) | "[Defendants' conspiracy] appears to have had the effect of increasing margins at both the manufacturer and distributor levels at the expense of the plaintiffs, who were forced to pay supracompetitive prices for DDC parts." |
| Plaintiffs' Brief in Support of Class Settlement, p.4 (Diamond Docket No. 26) | "the Settlement Agreement expressly provides that the Settlement Class may maintain its claims for damages, including damages related to overcharges by the Settling Defendants, against the Remaining Defendants." |

3